In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 25-2000

JEFFREY HINEMAN,

*Petitioner-Appellee,*

*v.*

DAISY CHASE,

*Respondent-Appellant.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:24-cv-00415 — **Nancy Joseph**, *Magistrate Judge.*

———————————

ARGUED APRIL 10, 2026 — DECIDED JULY 20, 2026

———————————

Before ROVNER, ST. EVE, and PRYOR, *Circuit Judges.*

ST. EVE, *Circuit Judge.* A jury found Jeffrey Hineman guilty
of first-degree child sexual assault after a two-day trial in a
Wisconsin county court. Hineman sought postconviction re-
lief in state court, which the Wisconsin Supreme Court ulti-
mately denied. Hineman then petitioned for federal habeas
relief, arguing that the prosecution suppressed material evi-
dence and that his defense attorney's performance at trial was
prejudicially defective. The district court granted Hineman's

petition, but we reverse that decision and deny habeas relief because the Wisconsin Supreme Court reasonably applied federal law in concluding that neither the suppressed evidence nor counsel's performance impacted the outcome of Hineman's trial.

## I. Background

### A. Factual Background

Hineman had a romantic relationship with SJS's mother when SJS[1] was born in April 2008. Though Hineman was not SJS's biological father, he stayed involved in SJS's life for a little over a year until SJS and his mother moved away in September 2009. SJS's mother eventually lost custody and SJS moved in with his biological father.

In 2013, Hineman contacted SJS's grandmother asking to reestablish a relationship with SJS. SJS's father and grandmother agreed and allowed Hineman to have regular contact with SJS. Hineman spent time with SJS in SJS's home, bought him gifts, took him shopping, and played with him in the park.

In October 2014, when SJS's father was hospitalized with a severe illness, Hineman stayed in SJS's home for about a week to watch and care for the child. Often, Hineman was alone with SJS. Hineman stayed in the house with SJS the week of Halloween.

Around Christmastime of that year, SJS's father and grandmother started noticing changes in SJS's relationship with Hineman. Though SJS previously had a positive relation-

---

[1] SJS is the minor victim in the underlying child sexual assault case.

ship with Hineman, he stopped wanting to be around Hineman, though he did not explain why. In January 2015, SJS also began showing behavioral and anger issues both at home and at school. His behavioral problems culminated in a March 12, 2015, report to Child Protective Services ("CPS") from SJS's therapist. The CPS report indicated SJS had displayed troubling behavior, including pulling his pants down in class and at home and acting as if he was going to defecate on the floor. SJS's therapist also reported that SJS was observed at school sucking on his pen cap, moving his head up and down while slurping, and telling a classmate that it "feels good when someone sucks on your privates." Though initially SJS said he learned about this from a Garfield movie, he later told his father that Hineman told him. The CPS report stated, "Reporter indicates that no information was given by [SJS] that Hineman had touched him or forced [SJS] to touch Hineman." The therapist reported that she told SJS's father and grandmother about her concerns and they no longer permitted Hineman to have contact with SJS.

On June 5, 2015, the Racine County Sheriff's Office received a copy of the March CPS report. The sheriff's office assigned the case to Investigator Tracy Hintz, who began her investigation by reviewing the CPS report and summarizing its contents in a police report. Hintz's report described SJS's concerning behavior and stated that SJS had been sucking on a pen at school, told a classmate it "feels good to have your privates sucked on," and indicated that Hineman had told him this. Hintz also wrote in her report that "[n]o specific information was given on if [Hineman] touched [SJS] or forced [SJS] to touch [Hineman]."

Hintz interviewed SJS's father and grandmother and coordinated a forensic interview of SJS, which took place on August 4, 2015. During the forensic interview, SJS disclosed to the interviewer, Heather Jensen, that Hineman had touched him inappropriately. Hintz visited Hineman's residence the following day to interview him. Hineman was not home when Hintz arrived, but he soon drove by in his truck and then, seeing Hintz's police car, drove off. Immediately after, he told Hintz on the phone that he was an hour away. He returned within minutes of the call and Hintz interviewed him.

The following day, the State filed a criminal complaint charging Hineman with first-degree child sexual assault for sexual contact with a person under the age of thirteen, in violation of Wisconsin Statute § 948.02(1)(e).

## B. Procedural Background

The case against Hineman proceeded to trial. The State made various pre-trial disclosures to Hineman, including Hintz's report detailing the March CPS report, but did not disclose the CPS report itself. At trial, the State called four witnesses: Jensen (the forensic interviewer), SJS, SJS's grandmother, and Hintz.

Jensen testified to her interview process and provided expert testimony on common patterns in children's disclosures of sexual assault. She explained child sexual assault victims often delay disclosing what happened out of fear, shame, or ignorance that what happened to them was wrong. Hensen estimated around fifty percent of the children she interviews delay their disclosure. She also testified that children often disclose in a piecemeal fashion, sharing small parts of the story with different individuals over time.

Jensen next authenticated the video of SJS's forensic interview, which the State played for the jury. The video contained the following exchanges:

[Jensen]: Did [Hineman] ever do anything else that you didn't like? Tell me about that.

[SJS]: He touched my private parts.

Q: Okay. Tell me all about [Hineman] touching your private parts.

A: Ugh, my mom and dad were sleeping, and me and him were on the couch and he just touched my private parts.

Q: Uh-hmm. And then what happened?

A: He laughed at me.

Q: He laughed at you? Okay. Then what happened?

A: I woke my mom and dad up and I told them.

Q: Okay. And then what happened?

A: Um, he kicked [Hineman] out again, and he told him that—to never come back.

…

Q: Okay. And did [Hineman] touch on your clothes or your skin?

A: My clothes.

…

Q: … Did [Hineman] ever want you to do something to his privates?

A: Yeah, but I didn't do it.

Q: What did [Hineman] want you to do?

A: Touch his privates, but I didn't do it.

SJS stated during the interview that Hineman had touched him during the "wintertime" when he was six and that it happened four times, then later said Hineman touched him six times.

SJS testified following the forensic interview video. Initially he answered, "I don't remember," or "No" when the prosecutor asked whether Hineman had touched him. But SJS, who was nine years old at the time of the trial, relaxed and grew more responsive after admitting that he was nervous testifying, stating, "I think [Hineman] touched me on my private part." SJS said the sexual contact occurred the day after Halloween while he and Hineman were alone in the house and sitting on the couch together watching cartoons. He first said he told his grandmother and father what Hineman had done the day it happened, but later on cross-examination testified that he told them a few weeks after it happened and at different times.

SJS's grandmother testified that SJS had never told her or his father about the assault in any specific terms, explaining that while SJS "claims that he told his daddy … he didn't come right out and say what anything was." Instead, SJS told his father he did not want to be around Hineman anymore. The grandmother testified that she could tell something was bothering SJS and kept asking him what was wrong, but that he always said "nothing."

Hintz testified for the State regarding her involvement with the case. She recounted how Hineman attempted to evade her and lied about his whereabouts when she tried to

contact him at his home. Hintz also shared several of the explanations Hineman gave during the interview as to why SJS might falsely accuse him of sexual assault and supplied her reasons for disbelieving his explanations.

On cross-examination, defense counsel asked Hintz whether the August 2015 forensic interview was the first time SJS disclosed that Hineman had sexually assaulted him:

[Counsel:] And is that the first time that [SJS] says that [Hineman] touched his privates?

[Hintz:] I don't know if that's the first time [SJS] had said that. I know that was the first time that I had seen that. But I believe in the CPS report, that there was a statement in there that he said [Hineman] had done that. But I would have to look at the original report that came from CPS.

Q: Would that have been anywhere in your report if … there was a mention that [Hineman] had inappropriately touched [SJS]?

A: I don't know if I documented that. Whether or not I would have to look at my report again, in my original narrative to see if I did indeed write that in there.

Q: But if you were told that [there was inappropriate touching], you would have then put it in your report?

A: I would think I would have but it's not—I might have not put it in there but that's why I would have to look at the report and look at the original CPS. I believe it does state that he later says that.

Though defense counsel had access to Hintz's police report summarizing the CPS report and stating it contained no dis-

closure of sexual touching, counsel did not use Hintz's report to impeach her testimony.

Hintz testified that neither SJS's grandmother nor father mentioned any disclosure of sexual touching when Hintz spoke to them in July 2015, and that there was nothing about a disclosure in the police report she wrote after talking to them. Defense counsel also elicited that Hintz had been a police investigator for a long time, that it was important to document relevant facts in an investigation, and that if anyone had told her SJS had disclosed sexual touching, she should have included that information in her report.

Hineman, the sole defense witness, testified about his relationship with SJS and denied assaulting him. He also denied ever calling SJS his son, though the State played a snippet of an interview with Hineman where he said the opposite.

The jury found Hineman guilty, and the court sentenced him to twenty-five years' imprisonment.

Hineman filed a postconviction motion asserting that the State suppressed favorable material evidence in violation of *Brady v. Maryland* because it failed to disclose the March CPS report, and that his trial counsel was ineffective by failing to obtain that report. The postconviction court denied Hineman's motion, and the Wisconsin Court of Appeals reversed. The Wisconsin Supreme Court unanimously reversed the court of appeals, reinstating Hineman's conviction. Having reached the end of the line in state court, Hineman turned to federal court, filing the habeas petition at issue here. The district court granted Hineman's petition, and the State appealed.

## II. Discussion

"We review the district court's decision de novo, but our inquiry is an otherwise narrow one." *Schmidt v. Foster*, 911 F.3d 469, 476 (7th Cir. 2018) (*en banc*). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief after a state-court adjudication on the merits unless that decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1), (2). We focus our inquiry on the Wisconsin Supreme Court opinion "as the last reasoned state-court decision on the merits." *Schmidt*, 911 F.3d at 477.

Hineman's challenge implicates the first of the two avenues for relief under § 2254(d), arguing the Wisconsin Supreme Court unreasonably applied clearly established federal law. Again, our inquiry is narrow: Only the Supreme Court's holdings may constitute "clearly established federal law" under AEDPA, and the Court has "cautioned against stretching its precedent to declare state-court decisions unreasonable." *Id.*; *see also, e.g.*, *White v. Woodall*, 572 U.S. 415, 426 (2014). "These standards require federal courts to give the 'benefit of the doubt' to merits decisions issued by the courts of the sovereign States." *Klein v. Martin*, 607 U.S. 213, 220 (2026) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

"The term 'unreasonable' refers not to 'ordinary error' or even to circumstances where the petitioner offers 'a strong case for relief,' but rather to 'extreme malfunctions in the state criminal justice syste[m].'" *Mays v. Hines*, 592 U.S. 385, 391

(2021) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). A state court's application of Supreme Court precedent may be incorrect or even clearly erroneous yet still fall short of unreasonableness. *See McDaniel v. Polley*, 847 F.3d 887, 893 (7th Cir. 2017); *Shinn v. Kayer*, 592 U.S. 111, 118 (2020). We may intrude on a State's "sovereign power to punish offenders," only when the state court's decision "was so lacking in justification that there was an error … beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. "[A] state prisoner must 'show far more' than 'clear error.'" *Klein*, 607 U.S. at 220 (quoting *Shinn*, 592 U.S. at 118). This is, by Congress's design, a difficult standard to meet. *Harrington*, 562 U.S. at 102; *see also Klein*, 607 U.S. at 220 ("AEDPA sharply limits federal review of habeas claims raised by state prisoners."). Only in "those relatively uncommon cases in which state courts veer well outside the channels of reasonable decision-making about federal constitutional claims" is habeas relief appropriate. *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017).

This is not one of those uncommon cases. The state court did not "blunder so badly" that every fairminded jurist would agree its decision unreasonably applied Supreme Court precedent governing suppression of evidence and ineffective assistance of counsel claims. *Mays*, 592 U.S. at 392. We address each claim as follows.

**A. *Brady* Claim**

On appeal, Hineman maintains that the State withheld favorable evidence from him at trial in violation of his due process rights under the Fourteenth Amendment. He argues the State should have disclosed the March CPS report, which could have changed his odds at trial.

The prosecution's "failure to disclose favorable evidence upon a defendant's request 'violates due process where the evidence is material either to guilt or to punishment.'" *United States v. Walker*, 746 F.3d 300, 306 (7th Cir. 2014) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). The *Brady* rule applies not only to exculpatory evidence but also to impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985) (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)). To succeed on his *Brady* claim in the state postconviction proceedings, Hineman needed to prove the evidence at issue was (1) favorable, (2) suppressed, and (3) material to his defense. *Socha v. Richardson*, 874 F.3d 983, 987 (7th Cir. 2017). The Wisconsin Supreme Court correctly articulated this *Brady* standard and concluded Hineman failed to satisfy it because the CPS report, while favorable and suppressed, was not material. Now, to merit federal habeas relief, Hineman must show that the state-court decision "involves an unreasonable application of *Brady* and its progeny." *Snow v. Pfister*, 880 F.3d 857, 867 (7th Cir. 2018). On appeal, as below, the parties' arguments hinge on *Brady*'s materiality element.

Evidence is "material" for *Brady* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* In other words, the suppression of evidence must have "deprive[d] the defendant of a fair trial." *Harrington*, 562 U.S. at 104 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). We assess the likelihood of a different outcome "in light of the totality of the circumstances." *Bagley*, 473 U.S. at 683. As with the general *Brady* rule, the Wisconsin Supreme

Court accurately identified these precedents governing materiality under *Brady*.

Often, cumulative impeachment evidence is not material. *See, e.g.*, *Turner v. United States*, 582 U.S. 313, 327–28 (2017); *see also Socha*, 874 F.3d at 989 ("Impeachment evidence is not material if it is 'merely cumulative.'" (quoting *United States v. Dweck*, 913 F.2d 365, 371 (7th Cir. 1990))). This is a logical application of the *Brady* standard: cumulative impeachment evidence typically adds little to the picture before the jury. If the jury has already heard that a witness was using mind-altering drugs during the events he is testifying about, for example, additional evidence of drug use to impeach that witness would have no substantial likelihood of changing the trial's outcome because it is cumulative. *Turner*, 582 U.S. at 327–28. The materiality inquiry regarding cumulative evidence still turns on the standard set forth in *Bagley*—whether there is a reasonable probability of a different result had the evidence been disclosed. But in general, impeachment evidence that is "merely cumulative" "has no reasonable probability of affecting the result of trial." *Dweck*, 913 F.2d at 371.

The Wisconsin Supreme Court evaluated the CPS report alongside Hintz's police report containing nearly identical language and reasonably concluded that the CPS report was cumulative impeachment evidence with no substantial likelihood of changing the outcome of Hineman's trial. Hineman contends that he could have used the withheld CPS report to impeach Hintz's testimony suggesting the CPS report detailed a disclosure of sexual contact in March. Doing so would have weakened Hintz's reliability and clarified that SJS delayed his disclosure even longer, until August, perhaps casting doubt on the veracity of his claims. The CPS report, which

stated unequivocally that "no information was given by [SJS] that [Hineman] had touched him or forced [SJS] to touch [Hineman]," certainly could have impeached Hintz's testimony. But it was cumulative of the police report in Hineman's possession at trial, which stated, "[n]o specific information was given on if [Hineman] touched [SJS] or forced [SJS] to touch [Hineman]." Hineman continuously stresses the importance of impeaching Hintz's testimony and clarifying the disclosure timeline with the CPS report, but the police report containing a nearly identical statement would have achieved the same result. A fairminded jurist could agree this is the kind of case where the suppressed evidence is "merely cumulative and thereby has no reasonable probability of affecting the result of trial." *Id.*

This case differs slightly from other cases denying *Brady* claims based on cumulative impeachment evidence because here, Hineman never used the police report at trial to impeach Hintz's statement about the timing of SJS's initial disclosure. But *Brady* only requires the prosecution to disclose the relevant exculpatory evidence to the defendant, *Brady*, 373 U.S. at 87; it does not require the prosecution to ensure the defense uses all disclosed evidence advantageously. If Hineman's inability to impeach Hintz's testimony dating SJS's initial disclosure to March deprived him of a fair trial, it was because his counsel failed to use the police report to that end, not because the State suppressed the CPS report. And Hineman does not claim ineffective assistance of counsel on those grounds.

Perhaps not every court would agree with the state court's disposition given the CPS report was not cumulative to any evidence actually presented at trial. But "'if we can posit ar-

guments or theories that could have supported the state
court's decision, and if fairminded jurists could disagree
about whether those arguments or theories are inconsistent
with Supreme Court holdings,' we must deny the petition."
*Socha*, 874 F.3d at 987 (quoting *Kidd v. Lemke*, 734 F.3d 696, 703
(7th Cir. 2013)). We have no trouble identifying arguments to
support the state court's decision here.

At the very least, Hineman has not cited any Supreme
Court precedent saying it is unreasonable to find cumulative
evidence would not affect the trial outcome merely because
the defendant chose not to use the evidence in his possession
at trial. Accordingly, Hineman has not shown the state court's
decision to the contrary was an unreasonable application of
federal law under AEDPA's demanding standard. *See Carey v.
Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings
from this Court regarding" the circumstances of the state-
court trial, "it cannot be said that the state court unreasonably
applied clearly established Federal law." (citation modified)).

Following the district court's lead, Hineman insists the
state court erred beyond reasonable disagreement by divorc-
ing the two nearly identical statements in the police and CPS
reports from the totality of the circumstances at trial. But a
side-by-side comparison of the two statements reveals how
little would have changed had the State disclosed the CPS re-
port, regardless of the other evidence presented. A fair-
minded jurist could find that the two reports communicate
exactly the same thing for purposes of impeaching Hintz's tes-
timony on disclosure. Applying the deference due under
AEDPA, the state court's statement-to-statement analysis was
reasonable.

Moreover, Hineman incorrectly suggests that clearly established federal law required the state court to expressly walk through the totality of the evidence presented at trial in order to conclude the CPS report was immaterial. "Federal courts have no authority to impose" these kinds of "mandatory opinion-writing standards on state courts." *Klein*, 607 U.S. at 221 (citation modified) (quoting *Johnson v. Williams*, 568 U.S. 289, 300 (2013)). A state court "need not make detailed findings addressing all the evidence before it" to withstand federal habeas review. *Id.* at 221–22 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003)) (reversing lower court's decision granting habeas petition because the state court had "failed to discuss certain evidence that tended to undermine the State's case"). Indeed, the Court has upheld state-court *Brady* decisions even when they did not discuss the evidence at all. *See, e.g.*, *Harrington*, 562 U.S. at 99. Though the totality of the trial evidence must factor into the state court's ruling on materiality, *Bagley*, 473 U.S. at 683, no clearly established federal law requires state courts to expressly articulate this analysis in their opinions. *Bagley* certainly does not say so, *id.*, nor may we stretch *Bagley*'s holding to declare the state-court decision unreasonable, *Schmidt*, 911 F.3d at 477.

The district court arrived at the opposite conclusion relying on *Sims v. Hyatte*, where we articulated some of the factors courts should consider when evaluating the *Brady* materiality element. 914 F.3d 1078, 1089 (7th Cir. 2019). But *Sims* does not impose a requirement that state courts expressly walk through each factor or explicate every piece of evidence from trial. And as a non–Supreme Court opinion, *Sims* does not establish a basis for finding an unreasonable application of federal law under AEDPA. In demanding the Wisconsin Supreme Court recount all the evidence and weigh it in a specific

way, the district court failed to afford the deference AEDPA requires. *See Klein*, 607 U.S. at 222–23 ("AEDPA … bars federal courts from imposing opinion-writing standards on state courts and demands that the relevant state-court decision be given the 'benefit of the doubt.'" (quoting *Woodford*, 537 U.S. at 24)).

In any event, the Wisconsin Supreme Court's ruling on materiality was reasonable under the totality of the circumstances. This case turned on the credibility of a nine-year-old boy testifying about traumatizing events that happened when he was six, versus the credibility of an adult man. Though contradictions and inconsistencies appeared in both parties' testimony, the State presented ample evidence explaining SJS's inconsistent disclosures. SJS also admitted he was nervous testifying on the witness stand—understandably so given his age and situation. In contrast, defense counsel presented no evidence to rehabilitate or explain the weaknesses in Hineman's testimony. Hintz's testimony about her initial interaction with Hineman, where he evaded her and lied about his whereabouts, further degraded his credibility.

Further, Hintz's testimony regarding the date of SJS's initial disclosure was confused and uncertain, and Hineman successfully impeached her memory and the quality of her investigation on cross-examination. There was little to gain from further impeaching Hintz's statement that she "thought" the CPS report mentioned SJS's disclosure. Altogether, we cannot say all fairminded jurists would agree that a different outcome was substantially likely had the State disclosed the CPS report. *See Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.").

The district court gave short shrift to the strength of SJS's testimony while neglecting to acknowledge the factors compromising Hineman's testimony or the expert testimony explaining SJS's inconsistent disclosure. But our role under AEDPA is not to look for the strongest arguments against the state court's decision. Rather, a federal court considering a state prisoner's habeas petition "must carefully consider all the reasons and evidence supporting the state court's decision," *Mays*, 592 U.S. at 391, and give the state court the "benefit of the doubt," *Klein*, 607 U.S. at 220; *see also Mays*, 592 U.S. at 392 (explaining the question under AEDPA is not whether the district court "*itself* could see a substantial likelihood of a different result" but whether the state court "managed to blunder so badly that every fairminded jurist would disagree" with its decision (citation modified) (first quoting *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) and then quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009))). A fairminded jurist could see the State's case against Hineman more favorably and determine that the CPS report would not have changed the outcome of the trial.

## B. Ineffective Assistance of Counsel

On appeal, Hineman maintains he received ineffective assistance of counsel because his lawyer failed to obtain the CPS report. *See Strickland*, 466 U.S. 668. To succeed under a *Strickland* claim, a petitioner must demonstrate first "that counsel provided constitutionally deficient performance" and second "that this deficient performance prejudiced his defense." *Pierce v. Vanihel*, 93 F.4th 1036, 1047 (7th Cir. 2024) (quoting *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020)). "Failing to prove either element defeats a petitioner's claim." *Dunn*, 981 F.3d at 591.

As to counsel's failure to obtain the March CPS report for impeachment purposes, the Wisconsin Supreme Court correctly held that Hineman's *Brady* and *Strickland* claims rise and fall together because they use the same standard for "materiality" and "prejudice." Suppressed evidence is material and a counsel's deficient performance is prejudicial if there is a "reasonable probability" that "the result of the proceeding would have been different" absent the error. *Bagley*, 473 U.S. at 682 (extending the prejudice test from *Strickland* to materiality under *Brady* claims); *accord Harris v. Thompson*, 698 F.3d 609, 646 (7th Cir. 2012) ("The *Strickland* prejudice and *Brady* materiality standards are identical.")

As with the *Brady* materiality analysis, it is reasonable to conclude the result would not have changed had Hineman's attorney obtained the CPS report, since even when she had the police report containing identical information at her disposal, she did not use it to impeach Hintz's testimony regarding SJS's disclosure.

Hineman could have brought an ineffective assistance of counsel claim about his counsel's failure to *use* Hintz's police report to impeach her testimony regarding the disclosure timeline. But Hineman did not make that claim (and it would likely fail on the deficiency prong given the obvious strategic soundness of his lawyer's decision not to introduce evidence that revealed Hineman had talked to six-year-old SJS about oral sex).

Hineman also argues he received ineffective assistance because, had his counsel filed motions to obtain the March CPS report, she also would have obtained other CPS reports from April and May. But the Wisconsin court thoroughly reviewed the additional CPS reports and found them of no consequence

for Hineman's postconviction arguments. This factual finding was not clearly erroneous because the reports, which detailed SJS's worsening behaviors and his father and grandmother's suspicions about Hineman, added nothing new to the picture.

Hineman nevertheless argues that the April and May CPS reports could have changed the outcome of his trial by identifying alternative causes for SJS's behavior problems, exposing "investigative tunnel vision," and showing that the adults in SJS's life jumped to conclusions about sexual assault involving Hineman before SJS ever disclosed anything. But other evidence adduced at trial showed that the adults in SJS's life repeatedly asked him what was wrong, assumed something bad had happened, and assumed Hineman had harmed SJS months before SJS ever disclosed the assault. Trial evidence also showed Hintz's investigation was fixated on Hineman without looking into any alternative causes. Under these circumstances, the Wisconsin Supreme Court did not unreasonably apply federal law in concluding Hineman failed to show his trial would have come out differently had counsel performed differently. *See Cullen v. Pinholster*, 563 U.S. 170, 200–02 (2011).

*        *        *

The judgment of the district court is

REVERSED.